USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/2/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RODNEY STEADMAN,

                             Plaintiff,

       -against-

GOVERNMENT EMPLOYEES INSURANCE
COMPANY

                            Defendant.

No. 20 Civ. 01005 (CM)

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND VERDICT

McMahon, C.J.:

The court, for its findings of fact, conclusions of law, and verdict:

## I.    Findings of Fact

**FF1.**    On Friday, May 26, 2017, at around 4:00 PM, there was a two-car accident between a 2000 Ford Expedition XLT driven by Plaintiff Rodney Steadman and a 2000 BMW sedan driven by Wilhelm Wolfgang Stoeckl. Stoeckl backed his sedan into Steadman's SUV at the Shell Gas Station located at the intersection of Morningside Avenue and Hancock Place. (Dkt. No. 23-1 at 1 ("Stipulated Facts").) The Shell station is in the vicinity of 125th Street, in Manhattan. (Ex. 8, Stoeckl Dep. Mar. 28, 2019 ("Stoeckl") at 19, 22; Ex. 14, Steadman Dep. Feb. 15, 2019 ("Steadman") at 15. )[1]

**FF2.**    The accident occurred as Stoeckl was trying to move his car from one gas pump to another. (Stoeckl at 27-29.)

**FF3.**    Steadman's SUV was not moving when the BMW sedan impacted his vehicle. (Stipulated Facts; Steadman at 56).

---

[1] All exhibits can be found at Dkt. No. 24. Each attachment is a single exhibit – Dkt. No. 24 is Ex. 1, Dkt. No. 24-1 is Ex. 2, Dkt. No. 24-2 is Ex. 3, and so on.

**FF4.** Immediately prior to the events that resulted in the collision, Steadman's Expedition was positioned between one and two meters (3.2 - 6.5 feet) behind the BMW. (Stoeckl at 50.) I do not credit Steadman's testimony that his car was a full car length (which I estimate at between 12-15 feet) behind Stoeckl's car. (Steadman at 35-36.) Stoeckl was not at the pump, but was behind another car that was at the pump. (Stoeckl at 28-29, 39, 43). The photographs of the gas station (Ex. 16) reveal that Steadman's car would have been fully in the street if he had been positioned a full car length behind Stoeckl. Similarly, the diagram in the police report, prepared within one hour of the accident, shows that no part of Steadman's vehicle would have been on the gas station lot had he been a full car length behind Stoeckl's vehicle (Ex. 7 at 3), while Steadman testified that his car was partially in the gas station lot at the time the accident occurred. (Steadman at 53-54.) Moreover, common experience suggests that drivers do not ordinarily queue up in line so far behind the car in front of them, especially where, as here, a long line would have snaked well into the street.

**FF5.** The accident occurred because Stoeckl, whose car used exclusively diesel fuel, realized that he had pulled into line for a pump that did not dispense diesel fuel. (Stoeckl at 25-26.) Stoeckl's wife, who was riding in the passenger seat of the BMW, got out of the BMW to ascertain where the diesel pump was located, and then re-entered the BMW. (Stoeckl at 27-29.) Steadman confirms that Stoeckl's wife was outside of the BMW just prior to the accident; he saw a "lady [white lady, older] standing at the pump." (Steadman at 36.) Stoeckl realized that he needed to go to a different lane to get to the diesel pump, but the car in front of him was not finished pumping gasoline, so he could not pull forward to change lanes. (Stoeckl at 28.)

**FF6.** After his wife got back into the car, Stoeckl, whose car was fully stopped (Steadman at 43-44, 54; Stoeckl at 28-29), started to back up so he could relocate at the pump that dispensed

diesel fuel. (Stoeckl at 29.) Within three to five seconds, his vehicle encountered Steadman's bumper. (Stoeckl at 49-50, 52-53.) This timing is consistent with the estimated distance (between one and two meters) between the two vehicles immediately prior to the collision.

FF7.   The back of the BMW came into contact with the front of the Expedition. According to Stoeckl, the right rear passenger's side of the BMW came into contact with the right front passenger's side of the Expedition. (Stoeckl at 63, 65.) This is consistent with Steadman's testimony that, while the BMW backed directly into his vehicle (Steadman at 44), it appeared that the collision damaged the right side of the front of his Expedition more than the other side. (Steadman at 61.) It is also consistent with the police report, which notes that the rear middle of the BMW (Code "8") impacted the front middle of the Expedition (Code "2"), but that most damage to the Expedition was observed on the front right/passenger's side (Code "3"). (Ex. 7 at 1.) It is further consistent with the pictures of the Expedition to the extent they show some scratching to or discoloration of the chrome paint around the passenger's side headlight. (Ex. 9 at 4.)

FF8.   However, the pictures that were taken of the Expedition some weeks later (Ex. 9) show that car had more extensive damage on the front left/driver's side than on the front right/passenger's side. Specifically, the pictures show a dent in the front spoiler of the Expedition on the driver's side above the headlight (Ex. 9 at 5.) There appear to be several pieces of thick, clear tape over the top of this headlight and its frame. (*Id.*) There is also a small dent in the front bumper on the driver's side. (Ex. 9 at 2, 3.) The pictures also show damage to the Expedition's driver's side brake light in the rear of the car (which no one claims was involved in the accident). (Ex. 9 at 7.)

**FF9.**   The police report, prepared within one hour of the accident, reports no damage to the driver's side of Steadman's Expedition; the only damage noted is to areas "2" (center of front bumper) and "3" (passenger side front bumper). (Ex. 7 at 1.) The damage to the left side of the front bumper seen in the photographs (Ex. 9) is inconsistent with the contemporaneous police evidence, as well as with Steadman's testimony cited above. (Steadman at 61.)

**FF10.**   The BMW has a standard, not an automatic, transmission. (Stoeckl at 32.) This means that (1) to turn on the car, the clutch must be depressed – the driver does not need to step on the gas pedal to start the car (Stoeckl at 40) and (2) to back up, the car must shift into reverse (which requires that the clutch be depressed) and the gas pedal must be depressed (Stoeckl at 47). Stoeckl testified that he was stepping on both the clutch and the gas pedal at the time of the accident, because the car could otherwise not move. (Stoeckl at 47-48.) He referred to this as "slipping clutch." (Stoeckl at 48-49). I credit Stoeckl's testimony, because it is consistent with the way standard transmission cars work.

**FF11.**   Stoeckl testified that his car was moving at a very slow rate of speed at the time of the accident. (Stoeckl at 46-47.) That testimony is credible. It would have been all but impossible for the BMW sedan to have been moving at more than a couple of miles an hour, given the distances involved, as well as the fact that the BMW was, by Steadman's own admission, not moving just prior to the collision. (Steadman at 43.) It is also consistent with Stoeckl's testimony that the BMW was put into reverse from a standing (not moving) position immediately prior to his starting to back the car up. (Stoeckl at 35, 40, 43.) I specifically do not credit Steadman's testimony that Stoeckl's vehicle "took off fast" (Steadman at 44) or that it "flew" into the Expedition (Steadman at 44, 56), because that testimony is inconsistent with the credible testimony about the

distance between the cars, as well as with the negligible damage to the two vehicles, as discussed above and below.

**FF12.**   At the time of the collision, Steadman – a man 5'8" in height and about 180 pounds at the time (*see* medical records from the summer of 2017, passim) – was seated in the driver's seat (a bucket seat). (Steadman at 41.) He was seat-belted into place with a fully functional shoulder-lap combination belt. (*Id.*) According to Steadman, the seatbelt did not break during the accident and functioned as intended. (Steadman at 50-51.) His right hand was on the steering wheel, his right foot was on the brake of his Ford Expedition and his left foot was on the floor of the SUV. (Steadman at 52-53.)

**FF13.**   Immediately after the accident, Stoeckl pulled the BMW sedan slightly forward and both drivers got out of their cars. (Steadman at 57-60; Stoeckl at 54, 57.)

**FF14.**   The police were called to the scene. (Steadman at 60.) They arrived within a half an hour (Stoeckl at 68), and prepared an accident report (Ex. 7). As the report reflects, Stoeckl admitted than he had backed into Steadman's Expedition. (Steadman at 62; Ex. 7 at 1.)

**FF15.**   At his deposition, Steadman claimed that his SUV was damaged in the following particulars: cracked license plate holder; spoiler loosened and cracked all the way around; bumper loosened and dented; lights knocked out; broken plastic; dripping antifreeze; front of car rattling; and check engine light came on. (Steadman at 60-61.) The actual repairs that were made to the Expedition, at a repair shop chosen by Steadman, are summarized on the GEICO Estimate (Ex. 10) and included: replacing an LKQ bumper; replacing valance without fog lamps and tow hooks; replacing an A/M pad; replacing an LKQ grille, replacing an LKQ left headlamp and an A/M left fog lamp. This required $855.86 in parts, plus $225.60 in labor, $40.50 in paint supplies, $2.50 in other charges and sales tax of $99.80, for a total of $1,224.26 in damage. (Ex. 10 at 2.)

**FF16.** The GEICO estimate indicates that the left – i.e., driver's side – headlamp and fog lamp were replaced. (Ex. 10 at 2.) This is consistent with the photographs of Steadman's SUV, taken on June 20, 2017 (less than a month after the accident), in which much of the damage appears to be on the driver's side. (Ex. 9; *see* FF8.) However, this is inconsistent with the testimony of both Steadman and Stoeckl as well as the police report -- all of which indicate that the BMW damaged the passenger's side of the Expedition, and place all damage to the larger vehicle on the passenger's side, not the driver's side. (*See* FF7, FF9.) Thus, it would appear that this accident was not the cause of the broken driver's side head lamp and fog lamp that GEICO paid to repair.

**FF17.** The accident caused only minor damage to the Expedition, which is consistent with a low-speed "fender bender" type collision.

**FF18.** There was no discernable damage to the BMW from the collision (*see* Ex. 11 (photos of Stoeckl's vehicle)), despite the fact that the BMW was a much smaller vehicle than the Expedition, and so would have been expected to be more greatly damaged by any high speed encounter with a larger vehicle. This, too, is consistent with a low-speed, "fender bender" type collision.

**FF19.** At the scene, Steadman declined the offer of an ambulance. (Steadman at 63-64.)

**FF20.** The police report does not indicate that anyone was injured in the accident. (Ex. 7 at 1, 2.) Steadman obtained a copy of the police report about a week after the accident (Steadman at 77), but made no corrections to it. (Steadman at 67-68.)

**FF21.** No family members or friends of Steadman came to the scene of the accident. (Steadman at 64.)

**FF22.** Steadman testified that he took the car out of the gas station, parked it somewhere (he did not specify where), and then got in a cab and went to his home. (Steadman at 78-79.)

Steadman called his cousin Andrew Simms to move the car, although Simms did not have a set of keys to the Expedition. (*Id.*)

**FF23.** After returning to his home, Steadman took a cab to the emergency room of Lincoln Medical and Mental Health Center ("Lincoln Hospital"). (Steadman at 79, 84-85; Ex. 1.)

**FF24.** The parties have introduced the hospital records from Steadman's trip to Lincoln Hospital (Ex. 1). The court concludes that these records are the most reliable medical records in the case.

**FF25.** Steadman arrived at the hospital with a principal complaint of an unspecified injury of the right shoulder. (Ex. 1. at 7.) He also complained of "neck and back pain" due to a "bumper to bumper mvc" – shorthand for motor vehicle crash – "at gas station." (Ex. 1 at 12.) He told the ER triage intake person that "he was fine initially but now c/o [complains of ] "some neck discomfort and midback pain." (Ex. 1 at 13.) The reporter assessing appearance noted "no distress," that his gait was normal, and that his skin and extremities showed "no evidence of trauma." (Ex. 1 at 12.) He was "alert and oriented." (Ex. 1 at 13.) His skin was intact. (Ex. 1 at 15.)

**FF26.** Steadman was given a pain assessment ("loc: back"). He reported a pain intensity level of 2, which is at the low end of the traditional 10-point pain assessment scale. (Ex. 1 at 15.) He did not complain of dizziness or vertigo, and he was "able to rise in a single movement." (*Id.*) Steadman's head was "normocephalic, atraumatic." (Ex. 1 at 17.)

**FF27.** At Lincoln Hospital, Steadman's chest, cervical spine, and right shoulder were x-rayed within several hours of the accident. (Ex. 1 at 2, 5-6, 20-24.) The medical records indicate that Steadman's x-rays revealed that (i) his chest was normal (Ex. 1 at 20); (ii) his cervical spine had "disc narrowing and spurring at C4-C7" and "uncovertebral hypertrophy at these levels"

consistent with degenerative disc disease at C4-C7, but "no acute fractures or dislocations" (Ex. 1 at 22-23); and (iii) his shoulder showed "degenerative changes of the acromioclavicular joint" with no acute fracture or dislocation of the shoulder, unremarkable soft tissues, and no acute findings in the shoulder. (Ex. 1 at 24.) These "no trauma" findings are consistent with a self-reported pain assessment level of "2," as well as with a low speed "fender bender" type accident. The signs of degenerative changes in the shoulder and degenerative disc disease are consistent with the fact that Steadman was a 49-year-old individual with a long work history of working construction and doing heavy manual labor, which included heavy lifting and throwing and working with heavy materials, such as bags of recycling materials. (Steadman at 10, 83-84, 102-103, 215.)

**FF28.** The Lincoln Hospital discharge summary accords with this trier of fact's assessment of Steadman's situation: "Pt was parked at gas stain [*sic*, station], other crab [*sic*, car] backed up and now c/o back pain, shpduerl [*sic*, shoulder] pain, out of prortion [*sic*, proportion], with finding, No LOC [loss of consciousness], belted . . . MVA, minimal impact, but terrible complaints." (Ex. 1 at 18.) I credit the assessment of the physician who saw Steadman in the hours immediately following the accident, when he reported a low level of pain and showed absolutely no sign of any traumatic injury, yet made "terrible complaints . . . out of proportion, with finding."

**FF29.** Steadman was discharged from Lincoln Hospital after fewer than six hours "to Home or Self Care." (Ex. 1 at 2.) His diagnosis was "pain in right shoulder" and he was given a 15-day prescription of 500 mg Naprosyn (naproxen). (Ex. 1 at 2, 10.) His discharge papers do not indicate that he was given any follow-up instructions; they state only that Steadman was told to contact his primary care doctor if his symptoms do not improve or begin worsening. (Ex. 1 at 2, 18.)

**FF30.** I specifically do not credit Steadman's testimony that his doctors at Lincoln Hospital told him that he "needed to go get an MRI, because they looked at the x-ray and they saw something was wrong" or that "They told [him] something was wrong, that [he] need[ed] to go see a specialist." (Steadman at 90, 92.) Nothing in the hospital records corroborates that testimony; what appears in the hospital records suggests that it is not accurate.

**FF31.** Steadman had surgery a couple of months after the accident to try to repair a massive "full thickness" tear of the supraspinatus and infraspinatus. But Steadman has not proved by a preponderance of the evidence that this tear resulted from this particular minor automobile accident.

**FF32.** Steadman's right rotator cuff was seriously torn. (*See* Ex. 3 at 21 (Plaintiff's expert Dr. Baum noting that "The MRI of the right shoulder shows a full thickness rotator cuff tear with some atrophy."); Ex. 12 at 4 (Defendant's expert Dr. Dermksian reviewed a July 5, 2017 MRI report of Steadman's right shoulder which showed a "chronic full thickness tear of the supraspinatus and infraspinatus."); Ex. 13 at 3 (Defendant's expert Dr. Holtzman reviewed the same MRI which showed a "chronic full-thickness tear of supraspinatus and infraspinatus with retraction of the torn tendons by 4.5cms.").) The rotator cuff had so much retraction that it could not be surgically reattached. (Ex. 3 at 5, 14.)

**FF33.** A sudden tear of that magnitude, with retraction to that degree, is not consistent with the forces that were unleashed by a very minor impact accident, in which a vehicle much smaller than Steadman's backed, at very slow speed and over a distance of just a few feet, into Steadman's massive SUV, doing no damage to the smaller car and minimal damage to the SUV.

**FF34.** Additionally, the MRI report of the right shoulder performed on July 5, 2017 – only six weeks after the accident – indicates that the tear (and several lesser "chronic" tears) was

accompanied by a "90% atrophy" of the supraspinatus and infraspinatus muscles. (Ex. 12 at 4-5; Ex. 13 at 3.) This degree of atrophy (a word that refers to a gradual decline or a wasting away of vigor, generally due to lack of use) is, as Defendant's expert Dr. Dermksian, testified, "indicative of a longstanding problem with the right shoulder," rather than an acute injury that occurred just a few weeks earlier. (Ex. 12 at 5.)

**FF35.** Logic suggests that what happened here is that Steadman had a long-standing problem with his shoulder, which he learned when he consulted with a physician – something he testified he had not done since he was a child – after the accident. (Steadman at 119.) That strikes this trier of fact as far more likely than that that this very minor accident actually caused Steadman's rotator cuff to tear massively in two separate rotator cuff muscles.

**FF36.** Steadman's work history is also consistent with the existence of a long-standing rotator cuff injury – a far more likely source of this injury than the fender bender of May 26, 2017. (*See* FF27.) I note that Steadman had not been working for some period of time (he could not testify how long) immediately prior to the accident (Steadman at 82), which could account for atrophy of the muscles.

**FF37.** I acknowledge the possibility that the accident, minor though it was, might have somehow exacerbated a pre-existing shoulder injury or degenerative condition of Steadman's. But on this point the burden of proof was Plaintiff's and he has not carried it. The only evidence from Steadman's experts on this point came from Dr. Baum, his shoulder surgeon, who admitted that Steadman's x-rays showed "some joint degeneration" at the time of the accident, and opined that Steadman's rotator cuff tear was "due to the aggravating trauma of his motor vehicle accident." (Ex. 3 at 5.) However, a tear of the magnitude of Steadman's, and with that degree of retractions, does not seem consistent with an accident as minor as the one I find to have occurred; it seems

more consistent with a condition of long standing. Steadman alleges that the accident caused, in addition to numerous serious traumatic injuries, "exacerbation of pre-existing degenerative joint disease." (Pl.'s Proposed Findings of Fact & Conclusions of Law, Dkt. No. 31 at 3.) But he offers no expert testimony that would allow a trier of fact to ascertain just how much the accident "exacerbated" his pre-exiting injuries. Dr. Baum's statement that Steadman's rotator cuff injury was "due to the aggravating trauma of" the accident does not permit a trier of fact to assess with any certainty how much of the rotator cuff injury was pre-existing and how much was "due to the aggravating trauma."

**FF38.** As there were no prior studies or even medical complaints to use as a point of comparison, Dr. Baum's conclusion that the rotator cuff tear was caused by the accident appears to rest on Steadman's self-report that he was "a restrained driver involved in a motor vehicle accident" with "no history of pains or traumas prior." (*See* Ex. 3 at 20.) However, having found that Steadman exaggerated the details of the accident, I do not find Steadman a credible witness on this point. Indeed, Steadman apparently reported to Dr. Baum that he "went by ambulance to the emergency room at Lutheran Hospital," when he declined an ambulance and took a cab. This is consistent with Steadman's exaggeration of his symptoms at the Lincoln Hospital Emergency Room.

**FF39.** None of Steadman's other experts testified that the accident might have exacerbated a pre-existing or long-standing condition. Although Steadman's Lincoln Hospital records indicate "History: fracture" for both his cervical spine and right shoulder (Ex. 1 at 22, 24), none of the doctor-witnesses (including specifically Plaintiff's doctors) referred in their reports to any past fractures that resulted in injuries that could have been exacerbated. As for Defendant's witnesses, Dr. Holtzman did mention the possibility of "exacerbation," but he did not offer any opinion "with

regard to the right shoulder injury." (Ex. 13 at 7.) As a result, there is no basis in his testimony on which the court, as trier of fact, could make any finding that the massive damage to Steadman's rotator cuff either resulted from or was exacerbated by this very minor accident.

**FF40.** The court is not unaware that serious rotator cuff injuries can be quite painful, especially when the arm moves in particular ways. Plaintiff's expert Dr. Baum noted as much – stating that "any patient with this type of retracted tear would have surely sought previous medical care had this been a longstanding condition." (Ex. 3 at 4.) However, as mentioned above, Steadman was not working at the time of the accident and could not tell his questioner when he had last worked prior to the accident. (Steadman at 82.) It is, therefore, at least possible that Steadman was not engaged in activities that would have been painful in the months prior to the accident; his testimony does not rule out that possibility. Moreover, Steadman's doctors and Steadman himself all testify that he in fact reported to work at the Sanitation Department *after* the accident, and was "able to do physical work." (Ex. 2 at 2, 14; *see* Ex. 3 at 20; Ex. 4 at 3; Steadman at 132-33.) The manual labor that Steadman performed was painful for him (Steadman at 177), and the exertion could have alerted him to an underlying issue, or even caused further damage to his shoulder. No expert addresses any of this.

**FF41.** As with his shoulder injuries, the force of the impact from this low-speed accident between Steadman's vehicle and the much smaller car driven by Stoeckl and insured by GEICO is a far less likely source of Steadman's cervical and lumbar spine injuries than are his many years of performing heavy manual labor. This court is not persuaded by Steadman's doctors' testimony that he suffered a "traumatic injury" to his neck or spine. (Ex. 4 at 3, 9.) "Degeneration" (i.e., issues of long standing, not acute findings) in the cervical spine was apparent from Steadman's x-rays at Lincoln Hospital immediately post-accident. (Ex. 1 at 23.) As Dr. Holtzman credibly

testified, "his multilevel disc bulges and herniations must have existed long before the accident and . . . the low back pain with disc bulges must also have been a longstanding spinal situation." (Ex. 13 at 7.) Dr. Holtzman did suggest the possibility of exacerbation of these long-standing conditions, but was not able to offer an opinion one way or the other due to the lack of any prior studies. (*See id.*)

**FF42.** None of Plaintiff's doctors opined, or even suggested, that the accident aggravated Steadman's pre-existing back injuries. Dr. Merola noted "some normal age-related changes," but did not deem them contributory to Steadman's "additional" injuries. (Ex. 4 at 3-4, 9.) As was the case with Dr. Baum, Dr. Merola's notes of Steadman's "traumatic" injury seems to be based on Steadman's own account of the accident. (Ex. 4 at 3, 9.) Similarly, Dr. Murray merely notes Steadman's "history of being injured and rear-ended in an MVA in 2017," and lists the date of the accident as the date of the injury. (Ex. 5 at 3, 5.) He, too, appears to have relied on Steadman's account, which this court has deemed unreliable. (*See* FF38.) Dr. Refyman – Steadman's pain management doctor – expressly stated that, "No pre-existing conditions exist that affects the causality," (Ex. 6 at 75), which is inconsistent with the Lincoln Hospital records, which clearly showed pre-existing degenerative conditions immediately after the accident. Dr. Reyfman's conclusion that Steadman's injuries are causally related to the accident "is based on the fact that more than 3 years have passed since his accident and his symptoms of pain and discomfort have not abated" (Ex. 6 at 3); but causality does not follow logically from the fact that Steadman suffered pain for three years.

## II.   Conclusions of Law

### A.   Applicable Legal Standards

The plaintiff's burden is to establish the defendant's negligence by a fair preponderance of the credible evidence. *Salcedo v. Salvador*, No. TS-300057/20, 69 Misc. 3d 1214(A), 2020 WL 6603587 (Table), at *5 (N.Y. Civ. Ct. Bronx Cnty. Nov. 9, 2020).

To establish negligence under New York law, a plaintiff must show "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Soto v. United States*, No. 16-cv-6509, 2019 WL 3712189, at *5 (S.D.N.Y. Aug. 7, 2019) (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981))).

"Additionally, New York's 'no-fault' insurance laws place limits on any recovery by a person involved in an automobile accident." *Avlonitis v. United States*, No. 16-cv-2521, 2020 WL 1227164, at *5 (E.D.N.Y. Mar. 13, 2020) (internal quotations and citations omitted). Under New York's "no fault" law, the Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law §§ 5101 *et seq.*, "Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss." N.Y. Ins. Law § 5104.

Even where the evidence supports the plaintiff's claim that s/he suffers from a "serious injury," the plaintiff must also "establish by a fair preponderance of the credible medical evidence that the injury complained of was . . . causally related to the occurrence." *Bugge v. Sweet*, 90 A.D.2d 858, 859 (N.Y. 3d Dep't 1982), *aff'd*, 61 N.Y.2d 710 (1984); *see Avlonitis*, 2020 WL 1227164, at *7; *Evans v. United States*, 978 F. Supp. 2d 148, 164 (E.D.N.Y. 2013). "Additional contributory factors [may] interrupt the chain of causation between the accident and claimed injury

14

– such as a gap in treatment, an intervening medical problem or a preexisting condition . . . ."
*Pommells v. Perez*, 4 N.Y.3d 566, 572 (2005).

Where the plaintiff claims that the accident aggravated asymptomatic pre-existing conditions, the plaintiff is required to provide objective evidence that distinguishes aggravation of a pre-existing condition from the pre-existing condition itself. *Evans*, 978 F. Supp. 2d at 172 (E.D.N.Y. 2013) (citing *Dabiere v. Yager*, 297 A.D.2d 831, 832 (N.Y. 3d Dep't 2002))."[W]hether an injury is traumatic in nature or the result of degeneration is beyond the ken of laymen, requiring an expert's opinion." *Salcedo*, 2020 WL 6603587, at *9 (citing *Linton v. Nawaz*, 62 A.D.3d 434, 439 (N.Y. 1st Dep't 2009), *aff'd*, 14 N.Y.3d 821 (2010)). Notably, "In the absence of an explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's conclusion that plaintiff's condition is causally related to the subject accident is mere speculation insufficient to support a finding that such a causal link exists." *Avlonitis*, 2020 WL 1227164, at *7 (collecting cases).

**B.    Analysis**

**CL1.**   Defendant GEICO concedes liability (i.e., Stoeckl's duty and breach), including that Steadman bears no comparative negligence. (Stipulated Facts, Dkt. No. 23-1 at 1.) However, GEICO challenges whether the accident was the proximate cause of any serious injury to Steadman. (Def.'s Proposed Issues to be Tried, Dkt. No. 23-1 at 3.)

**CL2.**   Steadman has not established by a preponderance of the evidence that the accident with Stoeckl was the proximate cause of his injuries.

**CL3.**   Although Stoeckl caused the accident *ab initio* (FF1), the court's factual findings about the accident are not consistent with Steadman's injuries. (FF6, FF11-12, FF16-18, FF24-31, FF33-37, FF41.)

**CL4.**   GEICO has presented credible expert evidence that Steadman's injuries were caused by pre-existing conditions, including: degenerative changes, chronic tears, and atrophy of the right shoulder indicative of a longstanding rotator cuff problem (FF34), as well as pre-existing multilevel disc bulges and herniations that were the result of a longstanding spinal situation (FF41).

**CL5.**   Steadman failed to present expert evidence that establishes by a preponderance of the evidence that the accident, rather than these pre-existing conditions, was the cause of his injuries. His experts merely described his injuries as "traumatic," without a sufficient – or persuasive – explanation of why that was the case. (FF38, FF42.)

**CL6.**   Steadman also failed to present expert evidence sufficient to establish that the accident aggravated the pre-existing conditions that the court concludes he had at the time of the accident. His experts did not opine that any pre-existing conditions contributed to his injuries. (*See* FF42.) Dr. Baum, the one expert who mentioned the possibility of aggravation, did not provide "objective evidence that distinguishes aggravation of a pre-existing condition from the pre-existing condition itself." *Evans*, 978 F. Supp. 2d at 172. Further, Dr. Baum did not explain the basis for his conclusion that Steadman's injuries were caused by the accident, and not by other possible causes evidenced in the record, such as Steadman's long work history of construction jobs and heavy manual labor. *See Avlonitis*, 2020 WL 1227164, at *7. Such speculation is "insufficient to support a finding that such a causal link exists." *Id.* Moreover, the only discernable basis for Dr. Baum's conclusion is Steadman's account of the accident – which this court has found not credible. (*See* FF38.)

**CL7.**   Because Steadman has failed to prove causation by a preponderance of the evidence the court need not address the issue of damages.

## VERDICT

The verdict on the negligence claim is for GEICO, the Defendant.

The Clerk of Court shall enter judgment dismissing the claim, with costs to the Defendant, and then close the file.

These findings of fact and conclusions of law constitute a "written opinion."

Dated: December 2, 2020

_____

Chief Judge

BY ECF TO ALL COUNSEL